# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

MICHELLE A. BARR, as
Administrator of the Estate
of DONALD L. BARR, deceased,

      Plaintiff,

v.                                       No. 3:15-cv-01329-DRH-PMF

UNITED STATES OF AMERICA,

      Defendant.

## <u>MEMORANDUM AND ORDER</u>

**HERNDON, District Judge:**

## I. INTRODUCTION

This dispute between the estate of Donald Barr and the United States was submitted to the Court for a decision through live testimony, exhibits by consent, and depositions. The Court has carefully and thoroughly examined and considered all of this evidence, assessed the credibility of same, and now makes findings of fact upon which it draws reasonable inferences and conclusions to make the ultimate decisions in this case finding in favor of the plaintiff as follows.

## II. FINDINGS OF FACT

### a. Treating Facilities

Donald Barr came into Building 8 of the Veteran's Administration Hospital in Marion, Illinois ("Marion VA") asking to talk to someone. He was seen by

Collette Smith, LCSW, clinical care coordinator, who concluded Barr was at high risk for suicide. She made transportation arrangements for him to go to the ER. While waiting, Michele Barr, Donald's wife, arrived and a heated discussion ensued between husband and wife. Donald Barr was informing his wife, for the first time, that he had been caught looking at pornography on his work computer. Donald told his wife he was concerned about the status of his job after this incident plus he needed the help of the VA psychiatric staff. Mrs. Barr then learned that care coordinator Smith was about to drive her husband the short distance to the Marion VA ER and asked if she could do that instead. Of course, Collette Smith, who had assessed Mr. Barr as a high risk for suicide, which neither of the Barrs knew, was not about to let her patient out of her sight and would not allow that. Mr. Barr, participating in the conversation and observing all of the consternation, vacillated on whether he would go at that moment. Care Coordinator Smith then pursued the role of a mental health professional that saw the need to persuade her patient to do what was necessary at the moment. Smith did persuade Mr. Barr and he ultimately agreed to go with her to the ER.

Upon arrival at the Marion VA ER, psychiatrist Dr. Daniel Holly evaluated Mr. Barr. Dr. Holly wrote in his Psychiatry Consult note:

> "The veteran reports that over the past year he has been frequently viewing pornographic images on his work computer, during work hours. Late last Friday he learned (not officially, but though (sic) the grapevine) that his supervisor had taken his work computer and found the pornography on the hard drive. The veteran indicates that this is the 2nd time this has occurred. The last time was about 7 years ago.

[H]e was caught, but was given a second chance.  He knows that he is in grave danger of losing his job."

"He kept this information from his wife over the weekend.  Over the weekend he began to have active thoughts of suicide.  He told Ms. Smith that he thought about driving away from home in his truck and taking one of his 10 firearms and shooting himself.  He told me he had also thought of driving away from home, taking one of his sharp tools and cutting himself such that he would bleed to death.  He would not do this at home because he would not want his 17 y.o. daughter to find his body."[1]

The note, quoted above and dictated by Dr. Holly, recognizes Barr's past history of mental health treatment and diagnosis to include Generalized Anxiety Disorder, Depression, and PTSD.  Barr's primary treatment had always been psychopharmacological as Barr never voluntarily stayed with psychotherapy.  Dr. Holly diagnosed Barr was Adjustment Disorder with Mixed Emotional and Behavioral Features in a Veteran with a past history of Generalized Anxiety Disorder, Depression and PTSD.

To treat his suicidal ideation, Mr. Barr accepted transfer to Jefferson Barracks VA Medical Center or another similar treatment facility.  Arrangements were made by telephone between non-treating staff physicians at Marion VA and the Veteran's Administration Hospital at Jefferson Barracks ("Jefferson Barracks VA") for the latter facility to accept Donald Barr for inpatient mental health treatment, since the former did not have the accommodations for such.  Barr was conveyed to the south St. Louis medical unit by ambulance at 3:00 PM on May 6,

---

[1] It is appropriate for the Court to note as a pertinent aside based on the evidence to be adduced, that much significance is placed on Barr's verbalization of both a specific suicidal plan and the actual verbalization of it in the first instance.  The Court also notes this is the first, but not only, time he expresses a desire to isolate himself during the planned suicide.

2013.   As Mr. Barr waited for word about his potential transfer to Jefferson Barracks and then for the arrival of his transportation, Michele Barr sat with him, conversed easily, and assisted with obtaining water for him.   The two shared a couple of affectionate moments, particularly as he was about to leave, all without signs of immediate distress between them.   Mrs. Barr testified that she was worried about her husband and supportive of his desire to seek psychiatric treatment, inferences that can clearly be drawn from CNA Newbolds' note as she described in detail the time spent waiting on the decision to transfer and then the transfer itself.

The only indication in the record of the events from the time of Barr's admission at Jefferson Barracks VA on May 6th until his first full mental health evaluation at 8:00 AM on May 7th, comes through the attending doctor's testimony wherein he stated the nurse to whom Barr spoke told him that Barr had told her he had "suicidal thoughts."   Barr's evaluation the first thing on the 7th was performed by nurse practitioner (NP), Dorothy Corrigan, Ph.D. (unrelated field), wherein she elicited critical information from Donald Barr that goes to the heart of the principle issue of standard of care in this case.   During her thorough history and physical, NP Corrigan inquired about Barr's suicidal ideations - almost 24 hours after he presented to Marion VA saying he planned to take his truck and a gun or a machete and drive away from the house somewhere and kill himself.

NP Corrigan's note is as follows:

"THOUGHT CONTENT:
"SUICIDAL THOUGHTS/BEHAVIOR:  Present
"Comment: 'I do. But I can't do it here.  No I don't really, I have [sic] my
daughter and grandchildren to think about.'"

Based on the entire record in this case, the Court finds this statement to be one
demonstrating expression of a suicidal ideation.  Just as important, perhaps, the
Court finds this statement to express a plan to carry out the act of suicide some
place other than the hospital.

Within three or four hours from this initial evaluation, Barr was evaluated
through an interview with the attending physician, the treating psychiatrist for Mr.
Barr, Dr. Peter Fahnestock.  Contrary to the Court's finding, Dr. Fahnestock
testified that he viewed the above statement to NP Corrigan as ambivalent. He
further testified that Donald Barr took the opportunity to rethink things in the
interval of time between the two interviews and that when he talked with him he
was clearly not suicidal; a conclusion supported, in Fahnestock's view, by the
assertion by Barr that he would not want to do such a thing to his daughter.  Dr.
Fahnestock found this statement to be a strong protective barrier against suicide.
In the medical record describing the initial interview with the patient, Dr.
Fahnestock notes that Mr. Barr does not have SI (suicidal ideation) at the time of
the interview but later notes that Barr says "I need help," in the context of a
discussion about taking or not taking specific pharmaceuticals.

The Court finds that, from a factual standpoint, there were ample reasons
for Dr. Fahnestock to question the resolve of Donald Barr to avoid suicide based
on his statement to avoid such action for the sake of the interests of his daughter

and grandchildren (note he never mentioned his wife which no one pursued to test that resolve). Furthermore, there was insufficient basis to conclude that Donald Barr was not suicidal as of May 7, 2013. There is nothing in the record to support a conclusion that from his admission on May 6th until his discharge mid-afternoon on May 8th Donald Barr received any psychiatric treatment other than medication which would not reach a therapeutic level in his system until after his suicide on May 10, 2013. Mr. Barr did not receive talk therapy. He did not receive group therapy. He talked to his treating psychiatrist twice, once for an initial interview and once for a discharge interview.

Therefore, the next and final interview with Dr. Fahnestock came the following midday, May 8, 2013. Not yet forty eight hours after being admitted and telling the admitting nurse he wants to kill himself and a mere forty eight hours after telling the referring professionals in Marion not only that he wanted to kill himself but exactly how he was planning to do it, Donald Barr was telling Dr. Fahnestock that he is fine and that he will not harm himself regardless of what happens with his job. Barr expressed he is no longer hopeless about the future and requests discharge. Unlike Collette Smith, the clinical care coordinator in Marion, who actively advocated for the trip to the ER when Donald Barr was expressing a desire to leave, Dr. Fahnestock allowed Barr's expression of a desire to go home to prevail without any attempt to discuss alternatives or express a professional opinion about the better of the clearly obvious alternatives.

Dr. Fahnestock made the decision to send Donald Barr home without discussing the merits or value of the decision with anyone who would be sharing the environment with Barr. Instead, the doctor talked with Michele Barr about whether she could pick her husband up or whether he should be sent by shuttle to the Marion VA and if all firearms and sharp instruments had been removed from the home. Dr. Fahnestock did not ask if she acquiesced in the decision or if she thought she could provide a safe environment for Donald Barr or even what to do or not do once he was home. Neither did the doctor have a conversation with the Barr's daughter who shared the home as well. The only post-discharge safety planning that was pursued was specific instructions given to Donald Barr himself.

b. **The Suicide and Resulting Injuries**

Two days after the discharge on May 10, 2013, Donald Barr used a yellow nylon rope to hang himself in his garage. He left the side door to the garage open so that his daughter, acting out of curiosity, was the first to find her father's lifeless body. The day started with Barr giving no one a clue of his plan, seeing his daughter off to school and giving his wife a kiss as she left for work. Even the fact that Michele did not get an answer when she tried to call a couple of times did not suggest something was amiss as that was not out of the ordinary. However, the day ended for Donald Barr when he took his own life.

Apparently, no one witnessed the suicide so there is no first hand description of it. There are, however, bits of information that help this fact finder reasonably infer what happened. This is not an exercise in gruesome story telling

but a compilation of the evidence in order to determine how much, if any, pain Mr. Barr felt before his demise. The final diagnosis of the autopsy report advances these relevant factors: The deceased was mortally injured and suffered a rope ligature on his neck and committed the act of suicide by standing on a bucket, then eliminating the support it provided and dropping a distance that could not have been greater than the height of the bucket; there was a superficial cervical spine laceration in the C4-C5 interspace secondary to a ligature drop injury; and he suffered abrasions on his left knee, legs and feet, consistent with bucket abrasions.

The detailed examination of the body provides a bit more detail. External examination of the neck and the separately provided and examined ligature provide some facts to help recreate what took place. The ligature was a two strand yellow nylon rope that's diameter averaged 3 cm or ¾ inch (by the medical examiner's calculation while using a standard measurement converter suggests that 3 cm is actually a little over one inch). The portion of the rope that was at the front of the neck was not 3 cm and instead .8 cm. The rope was twenty feet long. A knot is present that measured 11x8 cm or 4 1/3 inches by just over 3 inches (by the Court's calculation). The furrow caused by the rope ranged from .6 cm to 3.5 cm going around the neck completely. The abrasions mentioned in the final diagnosis include a 3x2 cm red-brown dried wound on the left knee. The left shin reveals an 8x2 cm dried red brown abrasion; the right shin a bright red 15x3 cm longitudinal abrasion. Numerous abrasions were found on both legs and feet.

The soil on the deceased leg matched that of the soil on the bucket. Internally, Mr. Barr's spinal cord was not "involved" and there was a small trauma induced laceration in the disc between the C4 and C5 vertebrae.

### c. Decedent's Pain

There was no testimony on the implications of what the physical findings above had on the type of pain Barr suffered before he lost consciousness and then ensuing death. There need not be such direct evidence as common sense and knowledge prevails and the Court may make reasonable inferences from the evidence contained in the written exhibit. Consequently, by inference the Court finds the following facts to be proven by the evidence.

The decedent was subject to pain for some period of time because his spinal cord was not severed by the dropping of a short distance from his starting point on top of the bucket found at the scene. The depth of the furrows in Barr's neck demonstrates a great deal of pressure to be able to thin the rope substantially and dig that far into the skin on his neck. Moreover, the medical examiner's notes on the autopsy diagram indicate that the furrows in the deceased neck were yellow brown. The Court makes the only reasonable inference that it can to find that the rope color was pressed into Mr. Barr's skin on his neck at the point where the rope was located. Therefore, the Court finds Barr suffered extreme pain for a period of minutes prior to his unconsciousness and death. The physical evidence helps determine and analyze the conscious pain and suffering and that it was the hanging by ligature that caused the deceased's death

and not some other cause.  Further, based on general knowledge of the amount of time it takes one to suffocate before losing consciousness, the evidence suggests that unconsciousness came before death and was present within minutes not hours.

It is not speculation to know that the knee, leg, and foot wounds, minor as they were and determined by the medical examiner to be related to contact with the bucket rather than some other unrelated episode, resulted from some degree of flailing.  It is beyond comprehension that stepping off the bucket to achieve the required dropping motion would cause such abrasions.   The unanswered question is whether the flailing that caused contact with the bucket and the resultant abrasions was the result of an involuntary reaction to the pain and inability to breath associated with hanging by the rope or whether it represented a failed attempt to change course when the deceased's thoughts turned from wanting to hang himself to knowing that such a decision was a serious mistake and the abrasions occurred when attempting to get the bucket back to a place of support.  What is clear is that nothing would suggest that the abrasions, which the examiner opined to be caused by the bucket, came at any time before the fatal event.  One can, and the Court does, infer that in addition to the physical pain and suffering that was obvious, the decedent suffered emotionally to some degree and for the same period of time he could surmise pain before being rendered unconscious.  Pain and suffering, physically and emotionally, can be inferred from all the evidence to have occurred over a period of a few minutes.  The analysis of

the monetary value associated with the pain and suffering is hereafter determined in the conclusion section.

### d. Effects on the Barr Family

The devastation on this small, close knit family is clear. The family unit consisted of Donald Barr, clearly the center of the family nucleus, Michele the wife and mother, and a daughter, Morgan. The daughter was, without dispute, a "daddy's girl." Regarding Michele, there was significant testimony and evidence concerning the differences in her between before and after the death of Donald Barr. But shockingly, demonstrative evidence that no one had to call attention to came in the form of the physical appearance of Michele as seen in the pictures of her with her husband and her as she looks today (even accounting for the passage of four and a half years). The woman presented in the photographs is that of a robust woman who looks no more than her age, or less, to the woman in the courtroom too many pounds less, with a drawn, troubled, and distressed face who looks older than her actual age.[2]

Mrs. Barr testified, credibly, that her husband was her life. She summed it up by saying she and her husband did everything together. They worked different shifts, but she made sure she was up to fix - or fixed in advance - his lunch so that he would not have to be troubled with it. They enjoyed each other's company when he came home from work and they talked. Even more so, they enjoyed

---

[2] Mrs. Barr testified that when she turns 65, her husband, had he lived, would have been a little more than 70 years old. Therefore, the inference drawn is that Mrs. Barr was a little more than 5 years younger than her husband. At the time of this trial, she would have been 55 or 56 years of age. Tragically, she looks to be ten years older than that.

riding his motorcycle together. They rode with a couple of different groups of other cycle enthusiasts who, one can infer, constituted their only social groups. She even went camping with her husband and their daughter, which clearly Donald and Morgan enjoyed much more than Mrs. Barr. They gardened together; tomatoes, green onions, and hot peppers being the staples of their garden. Donald loved hot peppers and tried to grow them as hot as he could. Her husband was handy with cars, mechanical things, but not so much carpentry. They were also in a pool, as in billiards, league together. One of Donald Barr's favorite things was to sing karaoke and, in particular, sing "Ring of Fire" to Michelle.

Since her husband's death, she testified there isn't a vegetable garden anymore. Furthermore, there isn't any more socialization with the motorcycle groups except once a year when they "force" her out to an annual Christmas Party. There isn't any more playing in a billiards league or socializing with that group of friends. In watching and listening to her testify, the clear inference is that she doesn't do those things anymore. As she went on to testify, her life now is her family, consisting of her daughter and granddaughter, her son and her grandson. In a very sadly touching moment during her testimony, Mrs. Barr described, credibly, how she sits at night with an old wartime ammo box which contains a portion of her husband's ashes, his wallet and his motorcycle keys. She describes the inability to sleep much, her thoughts consumed with the memories of Donald. She described the feeling she has as if a part of her was gone. Typically she finds

sleep when she is in her recliner and its early morning hours, not long before she has to go to work.

Mrs. Barr testified, credibly, that her husband was the main wage earner, with him working full time and her only working part time. They could afford medical insurance when it was paid out of his earnings but with that eliminated, she cannot afford medical insurance for herself and her family. She also testified, credibly, that Donald Barr would have worked until his wife, Michelle, was sixty-five, at which point in time he would have thirty years on the job as it was his goal to work as long as possible in order to build up his retirement income as much as possible.

Mr. David Gibson, a senior analyst with Vocational Economics, Inc, is well qualified to provide evidence regarding the wage loss in this case and he did so credibly. He provided information that the decedent was fifty-six almost fifty-seven years of age at the time of his death working through the federal Department of Veteran's affairs and was covered by a pension plan known commonly as FERS, Federal Employees Retirement System. Utilizing a reliable economic methodology, the economic expert explained that if Barr had lived and retired at ages sixty, sixty-five, or sixty-seven (the social security age of full retirement) he would have earned less in retirement than if he retired at age seventy as testified to by his wife.

Based on the credible testimony of Mrs. Barr, the Court finds that Donald Barr would have worked at least until age seventy and so it is that particular wage

loss amount, as calculated by Mr. Gibson, that the Court will focus on. Once again, with the reliable methodology utilized by the economic expert, Mr. Gibson was able to provide the Court with the wage loss associated with the death of Donald Barr to age seventy and net of his personal expenditures. Therefore, the Court finds the wage loss in this case, proximately caused by the death of Mr. Barr, to be one million, eighty one thousand, seven hundred and eighty two dollars ($1,081,782.00).

Morgan Barr, Donald's daughter, testified credibly about the devastation finding her father's body and his loss have been to her. Morgan was seventeen at the time of her father's death, according to the coroner's report. She testified that her birthday was ten days before his death. The reasonable inference to be drawn from this evidence is that Morgan's birthdate was May 1, 1996.

Upon arriving home on May 10, 2013 with her mother who picked her up from school, Morgan saw the garage door (it is inferred to be the door for people to enter the garage on the side, rather than the much larger automobile door) open and expected to find her dad at his work bench in line with the door. When she didn't see him there she looked to the right and saw her father hanging from the ceiling. She immediately ran out screaming and crying that he was hanging from the ceiling. Michelle Barr rushed past her daughter to enter the garage and once there managed to get her husband down from his hanging position in an effort to see if she could save him. In the meantime, Morgan was out in the front yard where she fell to the ground in anguish and pain, screaming and crying loud

enough to attract the attention of a neighbor who came immediately to her side. Upon being told what Morgan saw, the neighbor called 9-1-1.

A high school student at the time, Morgan found herself crying all of the time after finding her father's body. She was unable to focus on anything other than the image of her dad's corpse and on all she was missing by not having her "go-to person" around. She privately and openly asked the question "why" an interminable number of times. She second guesses herself about why she did not pay attention that morning when she was trying to get her dad to let her stay home from school and he was insisting that she go. Even when she went back to school, all she did was cry and was usually found in the rest room doing just that. She felt as though she could not accomplish anything in school and dropped out at a time when she was considered a junior. For an extended period, she had a very difficult time sleeping because of focusing on her dad and repeatedly asking the rhetorical question of herself – why it had to happen.

Morgan would always go to her father, during his life, when she needed someone to talk to or when she was feeling physically ill. She felt closer to her dad than her mom. She testified about what a great provider he was, making sure she had whatever she needed, within reason - which did not include buying her the pony she wanted. Morgan loved camping and fishing with her dad, even deep sea fishing off the coast of North Carolina where they successfully caught many Spanish mackerel. She fondly remembers watching old movies on TV with her dad, swimming, making bonfires, and cooking something called "Pizza

Mountain Pies."  They would go to a Chinese restaurant when the money allowed for it and usually took one annual vacation.  Often the vacation took them to Pennsylvania to visit her dad's relatives.

Morgan continues to mourn the loss of her father.  The Court can confirm this by her demeanor while testifying and her reaction to some of the questions. She still lives with her mom and vows that if she ever moved out it would be a move (after her dad's loss) in with a man that understands her desire to keep the family name, such that he would change his last name to "Barr" when they married.  She married such a young man but has not yet moved out of her mother's home.  This young Barr couple have a daughter and another child on the way as of the time of the trial.  Morgan has shown her daughter pictures of the deceased and talks about him to try and pass on some memories.

### III. CONCLUSIONS OF LAW

a. **Standard**

This case is brought pursuant to the Federal Tort Claims Act ("FTCA"). The FTCA makes "the United States liable in tort in the same manner and to the same extent as a private individual in like circumstances.  28 U.S.C. § 2674." *McKinnis v United States*, 2008 WL 5220504, *4 (N.D. Ill. Dec. 10, 2008).  An FTCA case is governed by the law of the place where the act or omission occurred, here, Illinois.  *Id*; 28 U.S.C. § 1346.  Plaintiff seeks wrongful death (Count I) and survivorship damages (Count II).

Under Illinois law, a wrongful death action is brought to compensate the surviving spouse or next of kin of a decedent for pecuniary loss sustained as a

result of the decedent's death. *See e.g. Patch v. Glover*, 248 Ill.App.3d 562, 573 (1993). "To state a cause of action under the Wrongful Death Act (740 ILCS 180/0.01 *et seq.* (West 2006)), the plaintiff must show that: (1) defendant owed a duty to the deceased; (2) defendant breached that duty; (3) the breach of duty was the proximate cause of the deceased's death; and (4) monetary damages resulted to persons designated under the Act." *Bovan v. Am. Family Life Ins. Co*., 386 Ill. App. 3d 933, 938 (2008).

The Illinois survival statute allows a representative of the decedent to maintain statutory and common-law actions that had accrued to the decedent before death. *Myers v. Heritages Enters., Inc.*, 332 Ill.App.3d 514, 516 (Ill.App.2002); 755 Ill. Comp. Stat. Ann. 5/27-6. Put differently, the statute permits the representatives of the estate to prosecute a claim for personal injury that the decedent could have brought had he lived. *Glover*, 248 Ill.App.3d at 573. In determining that a survival action may be had concurrently with a wrongful death action, courts have noted the need to preserve causes of action relating to substantial loss of earnings, medical expenses, and prolonged pain and suffering. *See Ellig v. Delnor Cmty. Hosp.*, 237 Ill. App. 3d 396, 401 (1992). Regarding pain and suffering in a survival action, courts have required that plaintiff prove the victims to "have been conscious of their pain and suffering before succumbing to the injuries." *Id*.

**b. Liability**

The plaintiff's retained expert, Dr. Scott Freeman, was very helpful to the Court. First of all, based on education and professional experience, each of which is very impressive, Dr. Freeman is well suited to provide opinions to the Court regarding the issues in this case as the standard of care in the community is the key to the answers underlying this matter. Dr. Freeman does not at any time throughout his testimony reach into the absurd for theories of liability, instead choosing to explain his opinions in the nature of what should be done for treatment protocols in this case in a very understandable manner. The testimony given by Dr. Freeman, in his expert capacity, was credible and testimony which the Court relied upon on key issues.

Dr. Freeman described for the Court the protocol required by the standard of care when a patient presents with severe suicidal thoughts – in other words – going beyond thoughts of death to having a specific plan of action. When such is the situation, as it was with Donald Barr, a one-day stay in the hospital is insufficient. A longer period is required in order to evaluate the patient's safety and to treat the patient to the point where the doctor finds that the patient has changed his way of thinking and how he feels enough that the risk of suicide is lowered sufficiently to cause the treating physician to believe the patient is out of immediate danger.

In commenting on the  decedent's statement, "I do [have suicidal ideations], but I can't do it here," the expert witness opined that the statement was important from the standpoint that it demonstrates that the patient is actively considering

suicide, so much so, that he is actively thinking about whether he would be able to commit suicide right in the hospital. So suicide was imminently on Donald Barr's mind and he was trying to determine if he could, in fact, carry out a suicidal plan. Freeman found that the statement was a marker of the severity of Barr's suicidal thinking.

The expert witness' opinion regarding what Dr. Fahnestock should have done, as Donald Barr's attending psychiatrist, to exercise the standard of care for the treatment of suicidal ideation, was to give Donald advice to stay in the hospital longer than asking to leave after only one full day in treatment. As an indicator that Barr would have followed the doctor's advice was the history that he had voluntarily come to the hospital, further indicating at least ambivalence about getting help. Freeman further opined that when a doctor strongly recommends additional days in the hospital, patients will usually follow that course and remain.

The expert witness then described the usual procedure, which the Court finds simple and even consistent with common sense, as follows. When a patient voluntarily signs himself into the hospital for psychiatric care, he is asked to also sign a three day notice requirement. So, logistically, the psychiatrist is given three days from the patient's declaration of a desire to leave to investigate thoroughly whether it is safe for the patient to leave. In that way, a patient's voluntarily act of seeking in-patient care is a conditional voluntary effort for evaluation and treatment based on the safety of the patient to leave.

In the three days that comprise the conditional voluntary discharge, the treating in-patient has time to check with the patient's outpatient psychiatrist, (if he has one and Barr did not) and the patient's family members and others who might have knowledge to learn whether the patient's behavior generally is consistent with the patient actually being safe and stable as opposed to just disingenuously telling the in-patient doctor and staff that he is safe. Here, Dr. Fahnestock and Mrs. Barr testified that the only discussion the former had with the latter was to verify she was coming to the hospital and could drive Mr. Barr home rather than having him wait for the shuttle which could take him to the Marion VA. Their conversation also included Dr. Fahnestock asking Mrs. Barr if she had removed potential weapons of self-destruction, like firearms and knives, from their residential property. It did not include an interactive discussion between the two regarding the wife's thoughts about whether she felt her husband was safe from self-harm or even about any other precautions Mrs. Barr should take such as making sure her husband was not alone.

Dr. Freeman also opined that Dr. Fahnestock had a standard of care responsibility to attempt to learn the severity of any possible job action facing Donald Barr, which was in the expert witness' view, the crucial trigger which led to Barr's suicidal ideation. To contradict this standard of care opinion by Freeman, Dr. Fahnestock asserted that to call the employer in this case, or any employer, would be counterproductive as it might provoke job action where none was intended due to a psychiatric concern with the employee at issue. Contrary to

that suggestion, Dr. Freeman testified that in his work with social workers, it is common for those staff members to call employers to learn the risk the patient was in of losing his or her job. Furthermore, Fahnestock theorized, based on his "knowledge" of how the Veteran's Administration works, that calling to inquire would not render useful information as it was too soon. In so testifying, Dr. Fahnestock failed to take into account the general policy of the VA regarding employment discipline.

Two persons testified in plaintiff's case in chief regarding the policy and practice of the Veteran's Administration relative to employment discipline generally and as it relates to Donald Barr's investigation. The person whose job responsibilities included discipline and union related matters, Tim Hartwell, testified that the progression for discipline is a five step process. The first step is admonishment, which could stay in a person's employment file for up to two years. The second step is reprimand, which could stay in the employment file for up to three years. The third step is disciplinary action suspension, which can last for a number of days no greater than fourteen. The fourth step is an adverse action suspension, which can be for a number of days no less than fifteen but could be more. The fifth and final step is termination. Mr. Hartwell surmised, reasonably and credibly, that Donald Barr would not have been terminated and would have received at most an admonishment. Barr's previous employment issue was too remote in time to be considered and so as far as the VA policy was concerned, he was a first time offender.

Moreover, Hartwell testified that in his time at the VA the only person to be terminated was an employee who had received child pornography - illegal to peruse - as opposed to adult pornography which is legal, who also went to prison for that crime. No one who had gone to an adult porn site on the government's computers had ever been terminated and there were approximately fifteen such instances. In addition, Terry Taylor, an information security officer charged with monitoring computer security, stated that the investigation involving Barr was in its earliest stages and no one was supposed to know it was being undertaken. He agreed that only the one person who committed a crime in viewing pornography had been terminated for viewing pornography.

It is more than abundantly clear that if Dr. Fahnestock had been interested in meeting the standard for medical care in the situation at issue, coming to some aid and comfort of Donald Barr about the very trigger that both Fahnestock and Freeman agree was the precipitating factor of Barr's suicidal ideations, he would have at least investigated with Tim Hartwell, or a similarly situated labor relations officer if more than Hartwell was so employed, the policy generally of employment discipline at the Veteran's Administration. If Fahnestock felt a direct inquiry about a specific patient was highly improper as he testified, his inquiry could have more easily been a general inquiry, without the need to identify Donald Barr or that the inquiry was coming from a psychiatrist. Dr. Fahnestock did not investigate or even prepare the decedent's family for his return home or investigate whether his patient's greatest fear, and precipitating cause of his

suicidal plans, was rationally based. While there is some degree of speculation whether someone in Mr. Barr's position would have ended his suicide plans had he known he did not face termination, Dr. Freeman opined, reasonably, that the risk of suicide would have been significantly diminished had he known and his belief was that Barr would not have carried out a suicidal act. Barr still would have had to face some degree of embarrassment but, logically, that seems the lesser stressor of the two issues.

Dr. Fahnestock failed Donald Barr in the discharge of the standard of care, to which Barr as a medical patient was entitled to expect and receive, in two significant respects, and these failures were the proximate cause of Barr's death by suicide.

The government in its defense of this case presented an expert witness on the subject of suicide. Ronald W. Marsh, Ph.D., was of no help to the Court because of unreliable methodology and lack of credibility. In his testimony, the counsel for plaintiff was able to cast substantial doubt on Marsh's stated qualifications, in particular his claim to be a "Board Certified Suicidologist." Marsh conceded that the "board" certification came not from the American Board of Professional Psychology, or the American Medical Association, but from the American Association of Suicidology in Washington, D.C. The witness at first testifies that in order to qualify for board certification one must have earned either a medical doctor degree or Ph.D. in psychology. However, he eventually admits to plaintiffs' counsel that one could qualify as a member of the American

Association of Suicidology having survived a suicide attempt, or be a family member of someone who had attempted suicide or been successful in the endeavor to commit suicide. He further said the "board certification" was an effort to establish certain standards for professionals claiming to have an expertise in suicide and who wished to testify in lawsuits. Marsh conceded that he is not in the active practice of psychology and never was - as his work was concentrated in "suicidology." There was a time when Marsh taught medical students on the use of the psychological autopsy. At present, he guest lectures from time to time.

In his report (Gov. Ex. 16), Marsh makes this curious statement, "As a suicidologist I have investigated and **treated** thousands of suicides." (Gov. Ex. 16 page 4; emphasis added.) He does not distinguish between the two as far as how many were investigations following suicide and how many and whether "suicides" means an attempt to treat a patient at risk for suicide but for whom his treatment plan and execution failed. It is quite clear to this Court that the weight and credibility to be assigned to Ronald Marsh's testimony is a great deal less than a medical doctor who regularly treats patients who are at risk of suicide or even a clinical psychologist who occupies himself in that manner as well.

The government's expert witness concedes that the Barr case presented a completely different set of facts than any other VA case on which he has worked. Barr, he points out, was not a death resulting from a service-related mental health matter, for example, suicide coinciding with PTSD from witnessing a peer battle

ground killing, rather from something "**he** did at work . . ." (Gov. Ex. 16, page 6; highlighting in the original.) On the question of whether the VA Marion and Jefferson Barracks properly assessed Barr for suicide risk, Marsh used his own assessment tool - not a peer reviewed protocol - as far as his report and testimony reveal, looking at fifteen separate risk factors. Of the fifteen, which Marsh professes to be those with the most statistical significance for suicide prediction, this witness found twelve to be present with Barr. The only ones not present were prior suicide attempts, isolation, and familial history of suicide. With eighty percent of the risk factors present in Barr, according to Marsh, he was rated as a "high moderate" to "low high" suicide risk. The VA used what is commonly used in suicide prediction of low, moderate. and high. The VA assessed Barr as high. Marsh did not explain on his scale what the cutoff points are for "low low", "moderate low", "high low", "low moderate", "moderate", "high moderate", "low high", "high", and "high high". Therefore, we don't know how Marsh came to the conclusion on his scale why Donald Barr was either "high moderate" or "low high" and what other factors one could look to in order to solve the differential. Despite the seeming discrepancy between his assessment and the VA's, he pronounces the VA assessment as correct. The methodology utilized by Marsh is therefore suspect.

With an unreliable methodology regarding a potential suicide assessment, it is hard to understand how Marsh arrived at the conclusion of miniscule risk. Marsh cited statistics from the universe of suicide cases and then acknowledged

that Donald Barr was in a narrower group of suicide victims, being those who are hospitalized for the treatment of the condition precipitating suicide. Marsh failed to account for the specific facts of this case which include the patient advising that he did have suicidal ideations but then immediately offering that he could not do such a thing in the hospital because of the impact on his family. That statement, it is recalled, with an immediate suggestion by the patient that he was fine and no longer had any suicide ideations. Marsh further fails to take into account the complete lack of family and support group preparation for a patient so recently assessed as a high risk of suicide. Ronald Marsh's insufficient basis and methodology strike a fatal blow to his opinions rendering them without credibility.

### c. Damages

When judges sit as the triers of fact, Federal Rule of Civil Procedure 52(a) requires that judges make "written findings in support of their conclusions." *Jutzi-Johnson v. United States*, 263 F. 3d 753, 758 (7th Cir. 2001). "This means, when the issue is the amount of damages, that the judge must indicate the reasoning process that connect the evidence to the conclusion[.]" *Id*. The Seventh Circuit has urged that when considering damages awards, trial courts study and contemplate comparable damage awards in similar cases. *Id*. at 759. When comparing relevant cases, courts may consider "the number of the decedent's children, whether they were minor or adults, and the closeness of the relationship between the decedent and his spouse and children." *Arpin v. United States*, 521 F.3d 769, 777 (7th Cir. 2008).

That said, the obvious place to start is the **wage loss amount**, one million, eighty one thousand, seven hundred and eighty two dollars ($1,081,782.00), which the Court has found to be a fact in this case.

Further, the Court finds that the estate of Donald Barr is entitled to his **conscious pain and suffering**, his wife and his daughter each to compensation for their separate **loss of society**. In an exhaustive effort to find verdicts in cases with some similarity as the Barr case, very little was uncovered. The vast majority of the cases were fairly remote in time, presented large distinguishing fact patterns and/or presented an inability to uncover enough pertinent facts to draw necessary analogy. What follows is a brief compilation overview of the Court's findings.

***McKinnis v United States***, **2008 WL 5220504 (N.D. Ill. Dec. 10, 2008):**
This case arose under the FTCA including wrongful death and survival claims. Decedent died shortly after discharge from the VA from an overdose of medication provided to him by the VA. Decedent died in the VA waiting room after pleading to be re-admitted. At time of death, decedent had two adult children. The total award entered in a bench trial on December 10, 2008 was $900,000 with $600,000 for conscious pain and suffering and $150,000 to each adult child.

***In Estate of Farver v. Correctional Medical Service of IL Inc.,***
**2003 WL 23316373 (N.D. Ill. Feb. 1, 2003):**

A male inmate committed suicide by hanging after his statements that he felt suicidal were not heeded. Decedent left behind 7 beneficiaries. On February 21, 2003, a jury awarded a total $1,750,000 with $250,000 for decedent's pain and suffering and $1.5 million in punitive damages.

***Zalesky v. Hanusa, M.D.,*** **2014 WL 8726740 (Ill. Cir. Ct. Sep. 24,**
**2009):**

Decedent committed suicide by hanging while under the psychiatric care and treatment of a medical doctor where suicidal ideations were made known. Prior

to death, decedent was being treated with prescription drugs and visits to the psychiatrist's office. A verdict was entered in favor of plaintiff in the amount of $800,000 for compensatory past damages on December 16, 2014. Decedent was survived by his wife and 4 minor children.

**Muse v Charter Hosp. of Winston-Salem, Inc. 117 N.C. App. 468, aff'd, 342 N.C. 403 (1995):**

Parents of child who committed suicide by drug overdose shortly after being discharged from hospital where he had been admitted for treatment of severe depression brought wrongful death action against medical providers. Parents argued that defendants had a policy or practice which required physicians to discharge patients when their insurance expired and that this policy interfered with the exercise of sound medical judgment. In a December 1991 trial, jury awarded parents $1,000,000 in compensatory damages. Jury also awarded a total of $6,000,000 in punitive damages, which was later reversed and remanded.

**Vasilik v Federbush, 327 N.J. Super 6 (App. Div. 1999):**

Jury found for father of deceased son who committed suicide by jumping in front of a dump truck shortly after visit to hospital crisis center while experiencing withdrawal symptoms from heroin. Father alleged hospital and its employees were negligent for failing to recommend voluntary hospitalization. Jury awarded $425,000 to the father.

**_Banach v Chester Scott, LSW_, 2004 WL 3999943 (Sep. 2004):**

This Court could not resolve the manner of suicide in the above case, but it is known that decedent committed suicide upon returning home after a diagnosis by defendant social worker and codefendant psychiatrist. Decedent was survived by his wife and numerous children. In her wrongful death action, plaintiff contended defendants were negligent in failing to properly diagnose decedent and failing to admit him to hospital. Tried in September 2004, the jury awarded $750,000 for pain and suffering.

**_Molchon v. Tyler_, 262 Va. 175 (2001):**

Virginia wrongful death case resulting in jury award of $1,304,456 based on claims alleging hospital's discharge of decedent violated applicable standard of care when decedent subsequently died as a result of gunshot wounds inflicted by police officers in circumstances the court dubbed as "equivalent of suicide." Reward was later reduced to $875,000 due to medical malpractice caps in a final court order dated May 19, 2000. Decedent was survived by an estranged ex-wife and multiple children.

***Sheehan v. US,*** **2003 WL 21938610 (N.D.Ill. Aug.11, 2003):**

The above is a non-suicide FTCA case where adult children brought wrongful death claim after loss of their 62 year old father when he was fatally struck by a postal truck. Decedent was survived by his wife and seven adult children. In a bench trial, a Northern District of Illinois judge awarded plaintiff $2,468.000 on August 8, 2003 for the wrongful death claim. Additionally, $8,000 was awarded for conscious pain and suffering with $1,600,000 awarded for the wife's loss of society and $110,000 for the loss of society to each of decedent's adult children. The wife was also awarded $20,000 for her loss of consortium.

***Christo v. Heilig Meyers Co.,*** **99L-8771 (IL Cook),** ***tried*** **April 11, 2002:**

Another non-suicide case, but used as a comparator in the *Sheehan* case above on an FTCA wrongful death claim, *Christo* is a wrongful death action filed in Cook County on behalf of the deceased's estate. Decedent was driving was when he was struck and hit by defendant's moving van after van had run a stop sign. Decedent was survived by his three adult children. The jury awarded $400,000 for conscious pain and suffering and $2,070,000 for loss of society to the three adult kids. No wage loss claim was made.

***Carrasco v. Healthcare and Retirement Corporation of America,*** **02L-7024 (IL Cook),** ***tried*** **August 11, 2006:**

Similar to *Christo*, *Carrasco* was used a comparator in the *Sheehan* case. Here, decedent suffocated while staying at a nursing home due to personnel's failures to clean and suction her trach tube which resulted in obstruction. The suffocation led to a coma and eventually death. Defendants admitted liability and the case was tried on August 11, 2006 for damages only. Ms. Carrasco left behind two adult children who each were awarded $680,000 for loss of society. Additionally, $1,360,000 was awarded on the wrongful death claim and $1,500,000 for the Survival Act claim.

After thorough analysis of the preceding, the Court gleans very little useful guidance from the prior cases due to their striking differences with the Barr case.

## VI. CONCLUSION AND AWARD

Considering all the preceding findings of fact, upon which this Court relies for the conclusions herein, and conclusions of law, the Court makes the following award of damages, including the wage loss which the Court heretofore ruled on:

| | |
|---|---|
| Wage loss: | $1,082,782.00 |
| Conscious pain and suffering: | $1,500,000.00 |
| Loss of society – Michelle Barr: | $1,500,000.00 |
| Loss of society – Morgan Barr: | $1,000,000.00 |

The Clerk of the Court is directed to enter judgment in Plaintiff's favor and against the defendant accordingly.

**IT IS SO ORDERED.**

Judge Herndon
2018.10.04
16:08:33 -05'00'

**United States District Judge**